Ali S. Razai
ali.razai@knobbe.com
Joseph F. Jennings
joe.jennings@knobbe.com
Brandon G. Smith
brandon.smith@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main St., 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Inzer C. Ni
inzer.ni@knobbe.com
Stacy Rush
stacy.rush@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1155 Avenue of the Americas, 24th Floor
New York, NY 10036
Telephone: (212) 849-3000
Facsimile: (212) 849-3001

Jonathan E. Bachand
jonathan.bachand@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Avenue N.W.
Suite 900
Washington, DC 20006
Tel: (202) 640-6400
Fax: (202) 640-6401

Yanna S. Bouris
Yanna.bouris@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East
Suite 400
Los Angeles, CA 90067
Tel: (310) 551-3450
Fax: (310) 601-1263

Attorneys for Defendant
LULULEMON USA INC.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>LULULEMON USA INC.,<br><br>            Defendant. | Case No.: 1:23-cv-00771-AS<br><br>**DEFENDANT LULULEMON USA INC.'S RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED PUBLIC VERSION** |

# TABLE OF CONTENTS

**Page No.**

I.      LITIGATION OVERVIEW ................................................................................ 1

II.     STATEMENT OF FACTS RELEVANT TO '484 PATENT SUMMARY
        JUDGMENT ................................................................................................... 1

        A.      The '484 Patent ...................................................................................... 1

        B.      Nike's Allegations of Infringement of the '484 Patent........................... 3

                1.      Allegations Against Chargefeel Mid ............................................ 3

                2.      Allegations Against Chargefeel Mid 2.0 ...................................... 5

III.    STATEMENT OF FACTS RELEVANT TO '046 PATENT SUMMARY
        JUDGMENT ................................................................................................... 7

        A.      The '046 Patent ...................................................................................... 7

        B.      Nike's Allegations Regarding Infringement of the '046 Patent ........................ 10

                1.      Allegations Against Chargefeel Mid .......................................... 10

                2.      Allegations Against Chargefeel Mid 2.0 .................................... 14

IV.     STATEMENT OF FACTS RELEVANT TO '749 PATENT SUMMARY
        JUDGMENT ................................................................................................. 18

        A.      The '749 Patent .................................................................................... 18

        B.      The Prior Art Adidas Shoes .................................................................. 20

                1.      The A3 Shoe ............................................................................... 22

                        a.      The A3 Shoe is Prior Art .................................................. 22

                        b.      Undisputed Material Facts Regarding the a3 Shoe.................... 27

                2.      The Wrestling Shoe.................................................................... 32

                        a.      The Wrestling Shoe is Prior Art....................................... 32

                        b.      Undisputed Material Facts Regarding the Wrestling
                                Shoe.................................................................................. 36

        C.      The Prior Art Knowledge of a Skilled Artisan .................................... 39

        D.      Secondary Considerations.................................................................... 45

## TABLE OF CONTENTS
### (*cont'd*)

**Page No.**

E.    Person Having Ordinary Skill in the Art .................................................. 46

F.    Other Undisputed Facts Regarding Obviousness ................................. 47

Pursuant to Local Rule 56.1, Defendant lululemon usa inc. ("lululemon") submits the following Statement of Uncontested Material Facts in connection with its Motion for Summary Judgment, and states as follows:

## I.  LITIGATION OVERVIEW

1.      The three patents-in-suit are: U.S. Patent Nos. 9,730,484 ("the '484 Patent"), the 9,375,046 Patent ("the '046 Patent"), and the 8,266,749 ("the '749 Patent"). *See, e.g.*, D.I. 134.

## II.  STATEMENT OF FACTS RELEVANT TO '484 PATENT SUMMARY JUDGMENT

### A.    The '484 Patent

2.      The '484 Patent is entitled "Article of Footwear Having a Flat Knit Upper Construction or Other Upper Construction." Ex. 1 ('484 Patent cover page). Bhupesh Dua and Edward N. Thomas are the listed inventors of the '484 Patent. Ex. 1 ('484 Patent cover page). The '484 Patent issued on August 15, 2017, and claims priority to an application filed on June 26, 2012. Ex. 1 ('484 Patent cover page).

3.      The '484 Patent has nineteen (19) total claims. Ex. 1 ('484 Patent at Claims 1-19). Nike asserts Claim 1. D.I. 134 at ¶1. Claim 1 of the '484 Patent is directed to an article of footwear and provides:

> 1. An article of footwear comprising an upper including a flat-knitted element formed from at least one yarn mechanically manipulated in a flat-knitting process, the flat-knitted element including a first layer having:
>> a central portion having a domed, three-dimensional structure configured for extending over the top of a foot;
>> a first side portion being formed of unitary construction with the central portion and extending from a first side of the central portion; and
>> a second side portion being formed of unitary construction with the central portion and extending from a second side opposite the first side of the central portion, the domed, three-dimensional structure shaped to extend

above the plane of the first side portion and the second side portion when the flat-knitted element is in a flattened configuration.

4.     Claim 1 of the '484 Patent requires a "flat-knitted element including a first layer having" "a central portion having a domed, three-dimensional structure configured for extending over the top of a foot." Ex. 1 ('484 Patent at Claim 1). The "domed, three-dimensional structure" is "shaped to extend above the plane of the first side portion and the second side portion when the flat-knitted element is in a flattened configuration." Ex. 1 ('484 Patent at Claim 1).

5.     Figures 10A-10C of the '484 Patent illustrate an embodiment of a "flat-knitted element" as required in Claims 1 and 11. The '484 Patent explains that the figures show an upper with a "three-dimensional structure formed through a flat knitting process." Ex. 1 ('484 Patent at 10:18-20). The "[u]pper 70 includes a central portion 71[.]" Ex. 1 ('484 Patent at 10:20-21). "[C]entral portion 71 has a domed shape formed through the flat knitting process. That is, the flat-knitting process forms central portion 71 to have a three-dimensional structure that is shaped to extend over the foot." Ex. 1 ('484 Patent at 10:35-38).

6.     Figures 10C and 10A of the '484 Patent are shown below:



Ex. 1 ('484 Patent at Figs. 10A, 10C). The yellow highlighting has been added by lululemon to denote the domed central portion 71.

7.     At the *Markman* hearing, the parties and the Court agreed that the claimed flat-knitted elements, which include the claimed "domed, three-dimensional structure," "have to be formed from the flat knitting process described in the claim." D.I. 127 at 83:2-5.  The Court construed "flat-knitted element" to mean "the formed flat-knitted element including a first layer…" D.I. 98 at 9.  The Court construed "flat knitting process" to mean "flat weft-knitting process." D.I. 98 at 8.

**B.     Nike's Allegations of Infringement of the '484 Patent**

8.     On April 15, 2024, Nike submitted a Rule 26(a)(2) expert report in support of their infringement assertions in this litigation.  Ex. 4 (Pastore Opening Expert Rep.).  Nike accuses the Chargefeel Mid (Style# 134142), the Chargefeel Mid. 2.0 (Style# 138146), and the Chargefeel Mid Lunar New Year (Style# 138086) of infringing the '484 Patent. Ex. 4 (Pastore Opening Expert Rep. at ¶2).  The Chargefeel Mid is representative of the Chargefeel Mid Lunar New Year, with the Chargefeel Mid Lunar Year differing from the Chargefeel only in that the Chargfeel Mid Lunar Year has a camouflage print on its upper. Ex. 4 (Pastore Opening Expert Rep. at ¶345).

**1.     Allegations Against Chargefeel Mid**

9.     To satisfy Claim 1 of the '484 Patent, Pastore's expert report for Nike identifies the collar of the Chargefeel Mid as the "flat-knitted element" having "a central portion having a domed, three-dimensional structure configured for extending over the top of a foot." Ex. 5 (Pastore Depo. Tr. at 15:22-17:19, 140:1-15); Ex. 4 (Pastore Opening Expert Rep. at ¶¶352-356, 363-365.

10.     The collar of the Chargefeel Mid prior to assembly is shown below:



Ex. 4 (Pastore Opening Expert Rep. at ¶354).  The image above depicts LULU_P_036, which is Exhibit 37 that is being lodged with the Court.

11.    ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████. Ex. 5 (Pastore Depo. Tr. at 31:13-32:9).

12.    At deposition, when asked if he agreed "that the three-dimensional structure" recited in Claim 1 must be shaped like a dome, Dr. Pastore answered: "it has to be domed, which is not specified as having the shape of a dome.  I think it's meant more colloquially." Ex. 5 (Pastore Depo. Tr. at 126:12-127:10).  Dr. Pastore testified that the plain and ordinary meaning of "domed" that he applied was that "it has sort of a curved structure that protrudes out of the plane." Ex. 5 (Pastore Depo. Tr. at 127:11-16).

13.    At deposition, Dr. Pastore testified that "[w]hen you're making three-dimensional structures with a knitting operation, you're going to have curvature associated with it." Ex. 5 (Pastore Depo. Tr. at 151:20-152:1).  When asked how "a domed, three-dimensional structure differ[s] from a three-dimensional structure if all three-dimensional structures that are knit will have curvature," Dr. Pastore admitted, "I don't know that it adds anything[.]" Ex. 5 (Pastore Depo. Tr. at 152:22-153:10).  He also testified, "I don't know that removing 'domed' would change the intent of the claim[.]" Ex. 5 (Pastore Depo. Tr. at 153:18-20).

14.    The following images show where the three-dimensional structure of the Chargefeel Mid collar prior to assembly contacts the wearer when the Chargefeel Mid is worn:



Ex. 36 (Brookstein Responsive Expert Rep. at ¶ 219).

**2.    Allegations Against Chargefeel Mid 2.0**

15.    To satisfy Claim 1 of the '484 Patent, Pastore's expert report for Nike identifies the collar of the Chargefeel Mid 2.0 as the "flat-knitted element" having "a central portion having a domed, three-dimensional structure configured for extending over the top of a foot."    Ex. 4 (Pastore Opening Expert Rep. at ¶¶357-361, 366-368).

16.    The collar of the Chargefeel Mid 2.0 after knitting is shown below:



Ex. 36 (Brookstein Responsive Expert Rep. at ¶213).  The above image depicts LULU_P_057, which is Exhibit 38 that is being lodged with the Court.

     17.    The collar of the Chargefeel Mid 2.0 prior to assembly is below:



Ex. 4 (Pastore Opening Expert Rep. at ¶¶359-360).

     18.

     Ex. 5 (Pastore Depo. Tr. at 31:13-32:9).

     19.    The following images show where the three-dimensional structure of the Chargefeel Mid 2.0 collar prior to assembly contacts the wearer when the Chargefeel Mid is worn:



Ex. 36 (Brookstein Responsive Expert Rep. at ¶219)

### III.  STATEMENT OF FACTS RELEVANT TO '046 PATENT SUMMARY JUDGMENT

**A.     The '046 Patent**

20.     The '046 Patent is entitled "Article of Footwear Incorporating a Knitted Component with Inlaid Tensile Elements and Method of Assembly." Ex. 2 ('046 Patent cover page).  Adrian Meir is the listed inventor of the '046 Patent. Ex. 2 ('046 Patent cover page).  The '046 Patent issued on June 28, 2016, and claims priority to an application filed on September 30, 2014. Ex. 2 ('046 Patent cover page).  The '046 Patent has twenty (20) total claims. Ex. 2 ('484 Patent at Claims 1-20).  Nike asserts Claims 1, 8 and 16 of the '046 Patent against lululemon.  (Stipulation re Issue Narrowing, D.I. 134 at ¶ 1).  Claims 1 and 8 are independent claims, and Claim 16 depends from Claim 1. Ex. 2 ('484 Patent at Claims 1, 8, 16).

21.     Claim 1 of the '046 Patent is directed to an article and provides:

> 1.     An article comprising:
> a plurality of webbed areas that include a plurality of courses formed from a first yarn, the webbed areas having a front surface, the webbed areas configured to move between a neutral position and an extended position, the webbed areas being biased to move toward the neutral position and
> a plurality of tubular structures that are adjacent to the webbed areas, the tubular structures including a plurality of courses;
> wherein at least one of the webbed areas or tubular structures is configured to stretch to move the webbed areas to the extended position in response to a force applied to the article
> wherein in the neutral position, a first area of the front surface is hidden from visual observation from a first viewing perspective, and
> wherein in the extended position, the first area of the front surface is revealed for visual observation from the first viewing perspective.

22.     Claim 8 of the '046 Patent is directed to an upper and provides:

> 8. An upper comprising:
> a plurality of webbed areas and a plurality of tubular rib structures;
> the plurality of webbed areas having a front side and a back side;

the tubular rib structures being disposed adjacent to the webbed areas;

the tubular rib structures having a first curved portion with a first curve length extending from the front side of the webbed areas, and a second curved portion with a second curve length extending from the back side of the webbed areas, the first curve length being greater than the second curve length;

the webbed areas configured to move between a neutral position and an extended position, the webbed areas being biased to move toward the neutral position; and

at least one of the webbed areas and the tubular rib structures configured to stretch from the neutral position to the extended position in response to a force applied to the upper.

23.    Claim 16 of the '046 Patent is directed to an article and provides:

16. The article of claim 1, wherein the plurality of tubular structures comprise (i) two co-extensive and overlapping knit layers and (ii) a central area that is generally unsecured to form a hollow between two knit layers.

24.    Claims 1 and 16 require "a plurality of tubular structures that are adjacent" to a "plurality of webbed areas." Ex. 2 ('046 Patent at Claims 1, 16).  Claim 8 requires "a plurality of tubular rib structures" that are disposed adjacent to" a "plurality of webbed areas." Ex. 2 ('046 Patent at Claim 8).

25.    Figures 4 and 5 of the '046 Patent show tubular rib structures 126 and adjacent webbed areas 128. Ex. 2 ('046 Patent at Figs. 4, 5).

26.    Figures 4 and 5 of the '046 Patent are shown below:



FIG. 4

FIG. 5

Ex. 2 ('046 Patent at Figs. 4, 5).

27.    The '046 Patent discloses that "[i]n different embodiments, tubular rib structures 126 can include a first tubular structure 146.  In some embodiments, first tubular structure 146 can be representative of other tubular rib structures 126." Ex. 2 ('046 Patent at 10:16-19).

28.    Claim 8 also requires webbed areas having a "front side" and a "back side." Ex. 2 ('046 Patent at Claim 8).  The '046 Patent describes that "[i]n some embodiments, first webbed area 142 can be concave on front surface 108. In other embodiments, first webbed area 142 can be convex on front surface 108." Ex. 2 ('046 Patent at 10:2-4).  The '046 Patent never shows a cross-section with a webbed area with two different length sides.

29.    The Court construed "tubular structures" to mean "tube-like structures" according to Nike's proposed construction. (Claim Construction Order, D.I. 98 at 3).   In its Claim Construction Order, the Court stated that Nike's construction "leaves open the possibility of a structure that has the shape of a tube but is filled," but also noted that "the proposed construction has limits." (Claim Construction Order, D.I. 98 at 5).  The Court gave an example: "Nike won't

be well-heard to argue that structures bearing none of the characteristics of a tube are in fact tubular…" (Claim Construction Order, D.I. 98 at 5).

**B.**    **Nike's Allegations Regarding Infringement of the '046 Patent**

30.    Nike accuses the Chargefeel Mid (Style# 134142), the Chargefeel Mid. 2.0 (Style# 138146), and the Chargefeel Mid Lunar New Year (Style# 138086) of infringing the '046 Patent. Ex. 4 (Pastore Opening Expert Rep. at ¶2).  The Chargefeel Mid is representative of the Chargefeel Mid Lunar New Year, with the Chargefeel Mid Lunar Year differing from the Chargefeel only in that the Chargefeel Mid Lunar Year has a camouflage print on its upper. Ex. 4 (Pastore Opening Expert Rep. at ¶248).

**1.**    **Allegations Against Chargefeel Mid**

31.    To satisfy Claims 1 and 16 of the '046 Patent, Pastore's expert report for Nike identifies "tubular structures" in the Chargefeel Mid as shown below:



Ex. 4 (Pastore Opening Expert Rep. at ¶266).  Pastore states that he "was able to identify a plurality of tubular structures that are adjacent to the webbed areas" based on "a visual inspection of the Chargefeel Mid."  Ex. 4 (Pastore Opening Expert Rep. at ¶266).

32.    To satisfy Claim 8 the '046 Patent, Pastore's expert report for Nike identifies the same "tubular structures" as "tubular rib structures" as shown below:



Ex. 4 (Pastore Opening Expert Rep. at ¶295).  This was based on his examination of the shoe and what he could "see."  Ex. 4 (Pastore Opening Expert Rep. at ¶295).

33.    To show the Chargefeel Mid includes "tubular rib structures having a first curved portion with a first curve length extending from the front side of the webbed areas, and a second curved portion with a second curve length extending from the back side of the webbed areas, the first curve length being greater than the second curve length," Dr. Pastore dissected the collar in order to make cross-sections of what he purports to be the tubular rib structures.  Ex. 4 (Pastore Opening Expert Rep. at ¶303).  The image of the cross-section of the collar used in the Chargefeel Mid as annotated by Dr. Pastore is below:



Ex. 4 (Pastore Opening Expert Rep. at ¶306).

34.     Dr. Pastore then "inserted a pick" into what he refers to as the "tubular structure." Ex. 4 (Pastore Opening Expert Rep. at ¶307).  Dr. Pastore encased the fabric in an epoxy and grounded down both the fabric and toothpicks to form a puck. Ex. 5 (Pastore Depo Tr. at 209:22-213:7).  Dr. Pastore relies on the below annotated image to show the purported difference in curve length:



Ex. 4 (Pastore Opening Expert Rep. at ¶307). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 5 (Pastore Depo. Tr. at 197:2-198:2).

At deposition, Dr. Pastore testified that this showed the Chargefeel Mids include a tube, stating,

"If it wasn't a tube, it wouldn't be able to hide the entirety of the pick that I inserted through the

opening.  There wouldn't be an opening for a pick or cylinder or rod or whatever to go through."
Ex. 5 (Pastore Depo. Tr. at 207:5-9).

35.    At deposition Dr. Pastore was asked "Well, couldn't you take a ball of yarn and put
a pick into it and it would disappear?"  Dr. Pastore answered, "I could.  I don't know how that's
relevant to this planar knit structure".  Ex. 5 (Pastore Depo. Tr. at 207:10-14).  Dr. Pastore never
attempted to insert a toothpick into a structure he agreed is non-tubular to show the results of
inserting a toothpick into a known non-tubular structure.  Ex. 5 (Pastore Depo. Tr. at 208:16-22).

36.    lululemon's expert Dr. Brookstein took cross-sections of the ribbed structure from
a portion of the Chargefeel Mid collar in an unstretched (neutral) configuration and a stretched
configuration as shown below:



Unstretched                                        Stretched

Ex. 36 (Brookstein Responsive Expert Rep. at ¶150).  The material was mounted between two
pieces of posterboard.  Ex. 7 (Brookstein Depo. Tr. at 142:12-143:23).

**2.    Allegations Against Chargefeel Mid 2.0**

37.    To satisfy Claims 1 and 16 of the '046 Patent, Pastore's expert report for Nike
identifies "tubular structures" in the Chargefeel Mid 2.0 as shown below:



Ex. 4 (Pastore Opening Expert Rep. at ¶267).  Pastore's expert report states that he "was able to identify a plurality of tubular structures that are adjacent to the webbed areas" based on "a visual inspection."  Ex. 4 (Pastore Opening Expert Rep. at ¶267).

38.     To satisfy Claim 8 of the '046 Patent, Pastore's expert report for Nike identifies the same "tubular structures" as "tubular rib structures" in the Chargefeel Mid 2.0 as shown below:



Ex. 4 (Pastore Opening Expert Rep. at ¶296).  Pastore based this on his examination of the shoe and what he could "see."  Ex. 4 (Pastore Opening Expert Rep. at ¶296).

39.     To show the Chargefeel Mid 2.0 includes "tubular rib structures having a first curved portion with a first curve length extending from the front side of the webbed areas, and a second curved portion with a second curve length extending from the back side of the webbed areas, the first curve length being greater than the second curve length," Dr. Pastore dissected the collar in order to make cross-sections of what he purports to be the tubular rib structures. Ex. 4 (Pastore Opening Expert Rep. at ¶303). The images of the cross-section of the collar used in the Chargefeel Mid as annotated by Dr. Pastore is below:



Ex. 4 (Pastore Opening Expert Rep. at ¶310).

40.     Dr. Pastore then "inserted a pick" into what he refers to as the "tubular structure." Ex. 4 (Pastore Opening Expert Rep. at ¶311). Dr. Pastore encased the fabric in an epoxy, and grounded down both the fabric and toothpicks to form a puck. Ex. 5 (Pastore Depo Tr. at 209:22-213:7). Dr. Pastore relies on the below annotated image to show the purported difference in the curve length:



Ex. 4 (Pastore Opening Expert Rep. at ¶311).  At deposition, Dr. Pastore admitted that the insertion of toothpicks into the fabric "distorted its relaxed state." Ex. 5 (Pastore Depo. Tr. at 197:2-198:2).

41.    lululemon's expert Dr. Brookstein took cross-sections of the ribbed structure from a portion of the Chargefeel Mid collar in an unstretched (neutral) configuration and a stretched configuration as shown below:




Unstretched    Stretched

Ex. 36 (Brookstein Responsive Expert Rep. at ¶155).  The material was mounted between two pieces of posterboard.  Ex. 7 (Brookstein Depo. Tr. at 142:12-143:23).

## IV.  STATEMENT OF FACTS RELEVANT TO '749 PATENT SUMMARY JUDGMENT

**A.    The '749 Patent**

42.    The '749 Patent is entitled "Article of Footwear Having a Textile Upper." Ex. 3 ('749 Patent cover page).  Bhupesh Dua and Edward N. Thomas are the listed inventors of the '749 Patent. Ex. 3 ('749 Patent cover page).  The '749 Patent issued on September 18, 2012, and claims priority to an application filed on March 3, 2004. Ex. 3 ('749 Patent cover page).

43.    The '749 Patent has twenty-one (21) total claims. Ex. 3 ('749 Patent at Claims 1-21).  Nike asserts Claims 1 and 14 of the '749 Patent against lululemon. D.I. 134 at ¶ 1.  Claim 1 is independent, and Claim 14 depends from Claim 13. Ex. 3 ('749 Patent at Claims 1, 14).

44.    Claim 1 of the '749 Patent is directed to a method of manufacturing an article of footwear and provides:

> 1. A method of manufacturing an article of footwear, the method comprising:
> simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure;
> removing the knitted textile element from the surrounding knitted textile structure;
> incorporating the knitted textile element into the article of footwear.

45.    Claim 13 of the '749 Patent is directed to a method of manufacturing an article of footwear and provides:

> 13. A method of manufacturing an article of footwear, the method comprising:
> knitting a first textile element and a second textile element simultaneously with knitting a surrounding textile structure, the first knitted textile element located within a first portion of the knitted textile structure, the second knitted textile element located within a second portion of the knitted textile structure,
> varying at least one of the types of stitches or the types of yarns in the knitted textile structure to impart a texture to the first and

> second knitted textile elements different from a texture of the knitted textile structure extending between the first and second portions;
>
> removing the first and second knitted textile elements from the knitted textile structure;
>
> incorporating at least one of the first and second knitted textile elements into the article of footwear.

46.     Claim 14 of the '749 Patent is directed to a method of manufacturing an article of footwear and provides:

> 14. The method of claim 13, wherein knitting a first textile knitted element simultaneously with a surrounding knitted textile structure includes knitting an outline of the first knitted textile element.

47.     Figure 9 of the '749 Patent illustrates "a textile structure 60 that may be formed with a wide-tube circular knitting machine[.]" Ex. 3 ('749 Patent at 7:38-40). The '749 Patent explains that "the types of stitches vary throughout textile structure 60 so that a pattern is formed with the outline of textile element 40. That is, differences in the stitches within textile structure 60 form an outline with the shape and proportions of textile element 40." Ex. 3 ('749 Patent at 7:41-45, 7:65-8:3). Figure 9 depicts one textile element 40 "on a front portion of textile structure 60" and another "on a rear portion of textile 60." Ex. 3 ('749 Patent at 7:55-58). Accordingly, two textile elements 40 "may be simultaneously formed in a single textile structure 60." Ex. 3 ('749 Patent at 7:58-60). The surface of a textile element includes varying textures. Ex. 3 ('749 Patent at Abstract). "Each textile element 40 is then removed from textile structure 60 with a die-cutting, laser-cutting, or other conventional cutting operation." Ex. 3 ('749 Patent at 8:4-6). The '749 Patent further explains that "[o]nce textile element 40 is removed from textile structure 60, seams 51-54 may be formed and textile element 40 may be incorporated into footwear 10." Ex. 3 ('749 Patent at 8:6-8).

48.     Figure 9 of the '749 Patent is shown below:



Ex. 3 ('749 Patent at Fig. 9).  The textile elements 40 have been annotated in green and the knitted

material outside of the knitted textile element has been annotated in purple by lululemon.

49.    The abstract states that the textile element can have different stich configurations

"to impart varying textures to a surface of the textile element."  Ex. 3 ('749 Patent) at Abstract.

**B.    The Prior Art Adidas Shoes**

50. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

51. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬

52. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



████████████████    ██████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

1.    **The A3 Shoe**

    a.    **The A3 Shoe is Prior Art**

58.    As set forth in the below paragraphs, the adidas a3 Shoe is prior art because it was made available to the public, sold, and offered for sale more than one year before the March 3, 2004 effective filing date of the '749 Patent.

59.    lululemon's expert David Brookstein relied on a sample of the a3 Shoe when rendering his opinions in this case.   Ex. 35 (Brookstein Opening Rep. at ¶¶43-65).  The physical shoe has an article number of 146095 and a designation of 05/02 indicating it was manufactured in May 2002. Ex. 8 (Trapp Depo. Tr. at 29:5-19, 31:13-18).  Nike's expert Dr. Pastore was able to inspect LULU_P_077.  A photograph depicting LULU_P_077 is shown below:



Ex. 35 (Brookstein Opening Expert Rep. at ¶51).  The red and green dashed lines were added by Dr. Brookstein to show the arrangement of the two adjacent fabric patterns.

60.    Nike's expert Dr. Pastore does not dispute that the a3 Shoe is prior art. Ex. 5 (Pastore Depo. Tr. at 237:18-21).

61.    Exhibit 21 to the Trapp Deposition ("Trapp Exhibit 21") is a physical adidas a3 Shoe from the adidas archives. Ex. 8 (Trapp Depo. Tr. at 99:4-22, 101:2-5).  The a3 Shoe is a running shoe. Ex. 8 (Trapp Depo. Tr. at 104:15-17).  The article number corresponding to the a3 Shoe, including Exhibit 21, is 677172. Ex. 8 (Trapp Depo. Tr. at 100:22-101:1).  The production date of Trapp Exhibit 21 is June 2001. Ex. 8 (Trapp Depo. Tr. at 100:19-21).

62.    Exhibit 28 to the Trapp Deposition ("Trapp Exhibit 28") is a collection of photographs that are an accurate representation of the physical shoe that is Trapp Exhibit 21. Ex. 9; Ex. 8 (Trapp Depo. Tr. at 128:1-17, 129:10-13).

63.    The document with Bates numbers adidas_lululemon_00014135-14214, Exhibit 27 to the Trapp Deposition ("Trapp Exhibit 27"), is an adidas Fall 2002 Catalog for the United States. Ex. 10; Ex. 8 (Trapp Depo. Tr. at 118:21-119:9).  Trapp Exhibit 27 would have been distributed to the public in the United States in the 2002 timeframe. Ex. 8 (Trapp Depo. Tr. at 121:13-16).  Trapp Exhibit 27 contains a listing for a shoe with article number 677172, which corresponds to the article number for Trapp Exhibit 21. Ex. 8 (Trapp Depo. Tr. at 125:7-22).  The same listing includes article number 146095, which corresponds to the article number of LULU_P_77.  The listing is depicted below:



## a³ Control



adiPRENE® ⊕

**F7150R   $130.00   13.3 OZ.**

Innovative energy management system. Synthetic, breathable mesh upper. Heel cushions upon impact on the lateral side, provides stability and protection from overpronation on the medial side. Guidance elements help the foot regain a neutral position just after footstrike. Unique transition plate for optimal loading during toe-off. Full forefoot adiPRENE® ⊕ and carbon outsole.

sizes: 6.5-13, 14, 15
677172   white | mercer blue | silver
146095   white | onix | legion blue | bluebird

Ex. 10 (adidas_lululemon_00014135-14214 at 14152).

64.

-24-

65. 

68.     The document with Bates numbers LULU_NIKE-0087765-0087776 is a copy of the Boston Globe newspaper published on April 5, 2002.  Ex. 15.  The "Business" section of the newspaper includes an article titled "Adidas goes distance for marathon ads" and discusses adidas' use of its sponsorship of the 2002 Boston Marathon to advertise the adidas a3 Shoe as shown below:



Ex. 15 (LULU_NIKE-0087765-0087776 at 87768).  The paper also includes an image of the a3

Shoe:

Ex. 15 (LULU_NIKE-0087765-0087776 at 87765).

69.    The physical item with Bates number LULU_P_074 is a banner advertising the adidas a3 Shoe as part of adidas' sponsorship of the 2002 Boston Marathon.  The banner includes an image of the adidas a3 Shoe.   The documents with Bates numbers NIKE0557541 and NIKE0557543 are images of LULU_P_074 as shown below:



Ex. 17 (NIKE0557541).



Ex. 16 (NIKE0557543).

###    b.    Undisputed Material Facts Regarding the a3 Shoe

70.    Nike's expert Dr. Pastore inspected the a3 Shoe.  Ex. 5 (Pastore Depo. Tr. at 27:22-28:2, 238:6-8).

71.    Nike's expert Dr. Pastore agreed that a skilled artisan would have understood the a3 Shoe would have been manufactured.  Ex. 5 (Pastore Depo. Tr. at 237:9-11, 245:17-20).

72.    Nike's expert Dr. Pastore does not dispute that the a3 Shoe is prior art. Ex. 5 (Pastore Depo. Tr. at 237:18-21).

73.    A skilled artisan would have recognized that the a3 Shoe includes warp knit components.  Ex. 5 (Pastore Depo. Tr. at 238:16-19).

74.    Nike's expert Dr. Pastore agreed that each a3 Shoe includes two side panels that are a warp knit component.  Ex. 5 (Pastore Depo. Tr. at 238:6-19).

75.    Nike's expert Dr. Pastore illustrated the warp knit "side panel" component in the below image of the physical sample of the adidas a3 Shoe (LULU_P_077):



Ex. 18 (Pastore Rebuttal Expert Rep. at ¶60).

76.    A skilled artisan would have recognized that the a3 shoe's warp knit components have two different textures.  Ex. 5 (Pastore Depo. Tr. at 238:6-239:1).

77.    lululemon's expert Dr. Brookstein illustrated the two different textures on the a3 Shoe by labeling them with red and green boxes as shown below.



Ex. 35 (Brookstein Opening Rep. at ¶51).

78.    Nike's expert Dr. Pastore agreed that a skilled artisan would have understood by looking at the a3 Shoe that its warp knit components contained two different textures. Ex. 5 (Pastore Depo. Tr. at 238:6-239:1).

79.    A skilled artisan would have known that in the 2004 time frame one could not warp "knit to shape." Ex. 35 (Brookstein Opening Rep. at ¶¶182-183).

80.    Nike's expert Dr. Pastore agreed that warp knitting in the 2004 time frame could not be "knit to shape." Ex. 5 (Pastore Depo. Tr at 246:20-247:8).

81.    A skilled artisan would have recognized that the a3 shoe's warp knit components were likely cut from a larger fabric structure. Ex. 35 (Brookstein Opening Rep. at ¶¶63-65).

82.    Nike's expert Dr. Pastore agreed that when making a warp knit component you would generally need to "make it out of a larger fabric" but "generally you wouldn't make a fabric that's exactly this size. It's hard to stop there." Ex. 5 (Pastore Depo. Tr. at 246:20-247:16).

83.    Nike's expert Dr. Pastore admitted that whether you could have surrounding textile structure would "depend on the exact shape that was involved and how it was designed." Ex. 5 (Pastore Depo. Tr at 255:9-16).

84.    lululemon's expert Dr. Brookstein submitted an expert report stating that the a3 shoe would have been made using warp knit fabric side panels that would have been cut from a

simultaneously knit surrounding textile material before being incorporated into the shoe. Ex. 35 (Brookstein Opening Rep. at ¶¶63-65).

85.    Nike's expert Dr. Pastore agreed that it would have been within the capabilities of a skilled artisan in 2004 to make the knit elements in the a3 Shoe the way Dr. Brookstein alleges they were made.  Ex. 5 (Pastore Depo. Tr at 261:18-262:1).

86.    Nike's expert Dr. Pastore agreed that at least some of the edges of the a3 Shoe's knit components would have been "most likely" cut from other fabric. Ex. 5 (Pastore Depo. Tr at 263:19-264:2).

87.    Nike's expert Dr. Pastore disagreed with Dr. Brookstein's conclusion that the a3 Shoe's knitted components were "necessarily removed from a surrounding waste material."  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶101).  He testified that he "can't say with absolute certainty that" that the shoe was made as alleged by Dr. Brookstein.  Ex. 5 (Pastore Depo. Tr at 263:11-17).

88.    Nike's expert Dr. Pastore contends that a skilled artisan would have understood that instead of making the panels as suggested by Dr. Brookstein one could have made "narrow strips of material." Ex. 18 (Pastore Rebuttal Expert Rep. at ¶102).  Dr. Pastore visually represented that as shown below:



Ex. 18 (Pastore Rebuttal Report at ¶102).  Dr. Pastore testified at deposition that this would not be within the scope of the claims because there would be no "surrounding" textile structure.  Ex. 5 (Pastore Depo. Tr. at 247:18-248:10, 250:3-18).

89.    Nike's expert Dr. Pastore contends that a skilled artisan would have understood that instead of making the a3 Shoe panels as suggested by Dr. Brookstein "multiple smaller textile

elements . . . could be arranged in repeating fashion as part of a large sheet of material.  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶102).  Dr. Pastore visually represented that as shown below:



Ex. 18 (Pastore Rebuttal Expert Rep. at ¶102).  Dr. Pastore testified at deposition that this would not be within the scope of the claims because there would be no "surrounding" textile structure. Ex. 5 (Pastore Depo. Tr. at 250:3-251:21, 253:16-22).  Dr. Pastore's report did not provide any other possible ways of making the knitted textile elements of the a3.  Ex. 5 (Pastore Depo. Tr. at 262:13-263:1).

90.    Nike's expert Dr. Pastore testified that what process was used "would depend on what type of equipment you have available" and "what your design goals are." Ex. 5 (Pastore Depo. Tr. at 256:1-22).

91.    Nike's expert Dr. Pastore also testified that if the knitted textile element of the a3 Shoe had two textures and the surrounding textile structure had the same two textures, that would also not be within the scope of the claims. Ex. 5 (Pastore Depo. Tr. at 258:9-259:6).  Dr. Pastore testified that to meet this claim limitation "there has to be a texture inside the element that is not found in the surrounding textile element."  Ex. 5 (Pastore Depo. Tr. at 100:15-18).

92.    Besides these three other methods, Dr. Pastore could not think of any other ways one could make the knit components of the a3 Shoe. Ex. 5 (Pastore Depo. Tr. at 259:7-16).

2.      **The Wrestling Shoe**

      a.      **The Wrestling Shoe is Prior Art**

93.      As set forth in the below paragraphs, the adidas Wrestling Shoe is prior art because it was made available to the public, sold, and offered for sale more than one year before the March 3, 2004, effective filing date of the '749 patent.

94.      lululemon's expert David Brookstein relied on samples of the Wrestling Shoe when rendering his opinions in this case, LULU_P_062 and LULU_P_063, which were marked as Exhibits 2 and 3 to the Trapp deposition, respectively. Ex. 8 (Trapp Depo. Tr. at 25:14-18, 30:19-31:12); Ex. 35 (Brookstein Opening Rep. at ¶¶66-88). Each of LULU_P_062 and LULU_P_063 has the inscription "08/00" on the label on the inside of the tongue, which signifies a production that the shoes have a production date of August 2000. Ex. 8 (Trapp Depo. Tr. at 31:13-18). A photograph depicting LULU_P_062 is shown below:



Ex. 35 (Brookstein Opening Expert Rep. at ¶74). The red annotations were added by Dr. Brookstein.

95.      The Wrestling Shoe was used in the 2000 Sydney Olympics. Ex. 5 (Trapp Depo. Tr. at 29:20-22).

96.      ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



99.     adidas made a Wrestling Shoe available for inspection by lululemon. Ex. 8 (Trapp Depo. Tr. at 55:18-22; 57:3-5).   Exhibit 8 to the Trapp Deposition ("Trapp Exhibit 8") is a collection of photographs of the Wrestling Shoe inspected by lululemon at the aforementioned inspection. Ex. 22; Ex. 8 (Trapp Depo. Tr. at 56:16-22).  The shoe photographed in Trapp Exhibit 8 is maintained by adidas as part of its footwear collection at adidas The Archive. Ex. 8 (Trapp Depo. Tr. at 57:20-58:12).  This shoe has article number 661203, which is the same article number as that for the physical shoes marked as Trapp Exhibits 2 and 3. Ex. 8 (Trapp Depo. Tr. at 57:6-13).

100.    Exhibit 4 to the Trapp Deposition ("Trapp Exhibit 4") is the physical Wrestling

Shoe inspected by lululemon and shown in the photographs in Trapp Exhibit 8. Ex. 22; Ex. 8

(Trapp Depo. Tr. at 63:8-13).  The production date of Trapp Exhibit 4 is May 2000. Ex. 8 (Trapp

Depo. Tr. at 63:14-17).  Trapp Exhibit 4 has article number 661203, which is the same as Trapp

Exhibits 2 and 3. Ex. 8 (Trapp Depo. Tr. at 63:18-19).  Trapp testified that the photographs in

Trapp Exhibit 8 are accurate representations of the physical shoe that is Trapp Exhibit 4. Ex. 8

(Trapp Depo. Tr. at 69:14-19).

101.    The document with Bates numbers LULU_NIKEFW-0079880-79882  is  a

screenshot of an article posted on ESPN.com's website.  Ex. 23.  The article shows a photograph

of Alexander Leipold wearing the Wrestling Shoes at the 2000 Sydney Olympics:



Ex. 23 (LULU_NIKEFW-0079880-79882 at 0079880).

102.     The document with Bates numbers LULU_NIKEFW-0087790-87871 is a copy of Vol. XXXVI, No. 2 of Wrestling USA Magazine published on October 1, 2000.  The magazine shows a listing for the Wrestling Shoe. Ex. 24 (LULU_NIKEFW-0087790-87871 at 0087850).

103.     The document with Bates numbers LULU_NIKEFW-0087921-88000 is a copy of Volume XXXVI, No. 1 of Wrestling USA Magazine published on September 15, 2000.  The magazine shows a listing for the Wrestling Shoe for $105.95. Ex. 25 (LULU_NIKEFW-0087921-88000 at 0087958).

104.     The document with Bates numbers LULU_NIKEFW-0088001-88074 is a copy of Vol. XXXVII, No. 11 of Wrestling USA Magazine published on May 15, 2002.  The magazine shows a listing for the Wrestling Shoe. Ex. 26 (LULU_NIKEFW-0088001-88074 at 0088029).

105.     The document with Bates numbers LULU_NIKEFW-0090206-90210 is a copy of Vol. 30, No. 2 of USA Wrestler Magazine published in November/December 2001.  The magazine shows listings for the Wrestling Shoe. Ex. 27 (LULU_NIKEFW-0090206-90210 at 0090208-10).

106.     The document with Bates numbers LULU_NIKEFW-0090211-0090213 is a copy of Vol. 29, No. 2 of USA Wrestler Magazine published in November/December 2000.  The magazine shows listings for the Wrestling Shoe. Ex. 28 (LULU_NIKEFW-0090211-0090213 at 0090213).

107.     The document with Bates numbers LULU_NIKEFW-0092919-92930 is the Affidavit of Nathaniel E. Frank-White.  Ex. 29.  As the Affidavit explains, Frank-White is a Records Request Processor at the Internet Archive, which provides a service known as the Wayback Machine.  The Wayback Machine allows users to search webpages by URL and access archived versions of a URL from available past dates.  In the Affidavit, Frank-White avers that Exhibit A to the Affidavit contains true and correct copies of browser screenshots from the Internet

Archive's records.  Exhibit A to the Affidavit shows a listing and image of the Wrestling Shoe for sale on adidas' website on August 19, 2000. Ex. 29 (LULU_NIKEFW-0092919-92930 at 0092929).

        **b.**      **Undisputed Material Facts Regarding the Wrestling Shoe**

108.    Nike's expert Dr. Pastore inspected the Wrestling Shoe. Ex. 5 (Pastore Depo. Tr. at 28:3-5, 239:2-4).

109.    Nike's expert Dr. Pastore agreed that a skilled artisan in 2004 would have understood the Wrestling Shoe would have been manufactured.  Ex. 5 (Pastore Depo. Tr. at 237:12-14, 279:7-10).

110.    Nike's expert Dr. Pastore does not dispute that the Wrestling Shoe is prior art.  Ex. 5 (Pastore Depo. Tr. at 237:22-238:2).

111.    A skilled artisan would have recognized that the Wrestling Shoe includes warp knit components. Ex. 35 (Brookstein Opening Rep. at ¶73).

112.    Nike's expert Dr. Pastore agreed that the upper of the Wrestling Shoe contains warp knit components.  Ex. 5 (Pastore Depo. Tr. at 239:5-7, 279:11-15).

113.    Nike's expert Dr. Pastore agreed that a skilled artisan inspecting the Wrestling Shoe when it was first on the market and first sold would have understood that the medial vamp panel and the lateral vamp panel are warp knit components.  Ex. 5 (Pastore Depo. Tr. at 239:8-22).

114.    A skilled artisan would have recognized that the Wrestling Shoe's warp knit components have two different textures.  Ex. 35 (Brookstein Opening Expert Rep. at ¶74).

115.    Nike's expert Dr. Pastore agreed that a skilled artisan would have understood that the Wrestling Shoe contains panels with two different textures.  Ex. 5 (Pastore Depo. Tr. at 240:1-7, 279:16-19).

116.    Nike's expert Dr. Pastore agreed that a skilled artisan would have understood that at some point in time the knitted components of the Wrestling Shoe were incorporated into the Wrestling Shoe.  Ex. 5 (Pastore Depo. Tr. at 279:20-280:1).

117.    A skilled artisan would have recognized that the Wrestling Shoe's warp knit components were likely cut from a larger fabric structure.  Ex. 35 (Brookstein Opening Expert Rep. at ¶¶84-88).

118.    Nike's expert Dr. Pastore admitted that the knit components of the Wrestling Shoe would "[m]ost likely" need to be cut from other fabric.  Ex. 5 (Pastore Depo. Tr. at 263:19-264:9).

119.    lululemon's expert Dr. Brookstein submitted an expert report stating that the exterior fabric of the Wrestling Shoe upper is a warp knit fabric and that a skilled artisan in 2004 would have recognized that based on an inspection of the shoe or pictures of the shoe.  Ex. 35 (Brookstein Opening Rep. at ¶73).  Dr. Brookstein stated that the Wrestling Shoe's warp material would have been cut from a simultaneously knit surrounding textile material before it was incorporated into the Wrestling Shoe.  Ex. 35 (Brookstein Opening Expert Rep. at ¶¶84-88).

120.    Nike's expert Dr. Pastore agreed that it would have been within the capabilities of a skilled artisan in 2004 to make the knit elements in the Wrestling Shoe the way Dr. Brookstein alleges they were made.  Ex. 5 (Pastore Depo. Tr. at 263:3-9).

121.    Nike's expert Dr. Pastore disagreed with Dr. Brookstein's conclusion that the Wrestling Shoe's knitted components were "necessarily removed from a surrounding waste material."  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶101).  He testified that he "can't say with absolute certainty that" the shoe was made as alleged by Dr. Brookstein.  Ex. 5 (Pastore Depo. Tr at 263:11-17).

122.    Nike's expert Dr. Pastore contends that a skilled artisan would have understood that one could have made "narrow strips of material."  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶135). Dr. Pastore visually represented that as shown below:



Ex. 18 (Pastore Rebuttal Expert Rep. at ¶135).  Dr. Pastore testified at deposition that this would not be within the scope of the claims because there would be no "surrounding" textile structure. Ex. 5 (Pastore Depo. Tr. at 247:18-248:10, 250:3-18, 262:12-263:1).

123.    Nike's expert Dr. Pastore contends that a skilled artisan would have understood that instead of making the Wrestling Shoe panels as suggested by Dr. Brookstein "multiple smaller textile elements . . . could be arranged in a repeating fashion as part of a large sheet of material." Ex. 18 (Pastore Rebuttal Expert Rep. at ¶135).  Dr. Pastore visually represented that as shown below:



Ex. 18 (Pastore Rebuttal Expert Rep. at ¶135).  Dr. Pastore testified at deposition that this would not be within the scope of the claims because there would be no "surrounding" textile structure. Ex. 5 (Pastore Depo. Tr. at 250:3-251:21, 253:16-22, 262:12-263:1).  Dr. Pastore's report did not

provide any other possible ways of making the knitted textile elements of the Wrestling Shoe. Ex. 5 (Pastore Depo. Tr. at 262:13-263:1).

124.    Nike's expert Dr. Pastore also testified that if the knitted textile element of the Wrestling Shoe had two textures and the surrounding textile structure had the same two textures, that would also not be within the scope of the claims. Ex. 5 (Pastore Depo. Tr. at 258:9-259:6, 262:12-263:1).

125.    Besides the three other methods, Dr. Pastore could not think of any other ways one could make the knit components of the Wrestling Shoe. Ex. 5 (Pastore Depo. Tr. at 259:7-16, 262:12-263:1).

**C.    The Prior Art Knowledge of a Skilled Artisan**

126.    U.S. Patent No. 2,047,724 ("Zuckerman") is entitled "Knitted Article and Method of Making Same." Ex. 30 (Zuckerman cover page). Zuckerman issued on July 14, 1936. Ex. 30 (Zuckerman cover page).

127.    Zuckerman qualifies as prior art to the '749 patent. Ex. 30 (Zuckerman cover page).

128.    Zuckerman states that its methods "simplify the production of knitted articles fashioned or shaped to conform with the foot" and permit relatively inexpensive manufacturing of those articles. Ex. 30 (Zuckerman at 1(L):5-10).

129.    Zuckerman describes knitting a sheet of fabric 13 "as a continuous strip on a knitting machine." Ex. 30 (Zuckerman at 1(R):45-50, 1(L): 45-1(R):2). This strip 13 is shown in Figure 1 of Zuckerman.



Ex. 30 (Zuckerman at Fig. 1).

130.    Zuckerman explains that its "continuous strip [13] compris[es] several blanks [11]" with each blank 11 having multiple textures.  Ex. 30 (Zuckerman at 1(L):1-15, 2(L):39-44, 1(R):50-2(L):11, 2(L):44-52, Fig. 1).

131.    According to Zuckerman, the varying textures can be caused by knitting with yarns that have different weight and durability, knitting in different arrangements such as varying rib arrangements, and knitting some areas more tightly than others. Ex. 30 (Zuckerman at 1(L):1-15, 2(L):39-44, 1(R):50-2(L):11, 2(L):44-52, Fig. 1).

132.    Zuckerman provides that each blank 11 (colored green) is "formed by cutting the continuous strip 13 across at intervals," leaving other portions of continuous strip 13 (colored purple) that are separate from blank 11, as shown in annotated Figure 1 below.  Ex. 30 (Zuckerman at 2(L):12-22).



Ex. 30 (Zuckerman at Figure 1).

133.    Zuckerman teaches folding the cut knitted textile element (blank 11) and incorporating it with other components to make a slipper.  Ex. 30 (Zuckerman at 2(L):53-2(R):37).

134.    Eberle, et al. Clothing Technology, Fourth Edition ("Clothing Technology") is prior art to the '749 patent.  Ex. 31 (Clothing Technology).

135.    Clothing Technology illustrates making textile elements by simultaneously knitting a surrounding textile structure and then removing the textile element from the surrounding material.



Ex. 31 (Clothing Technology at LULU_NIKEFW-0095646).

136.    DE 299 15 625 ("Knoblauch") is a German Published Utility Model Application from 2000.  Ex. 32 (Knoblauch).

137.    Knoblauch is prior art to the '749 Patent.  Ex. 32 (Knoblauch).

138.    Knoblauch is entitled "Knitted fabric web for the production of prefabricated shaped parts." Ex. 32 (Knoblauch at LULU_NIKEFW-0095626).

139.    Knoblauch describes knitting multiple panties (each with multiple textures) in a single sheet of material. Ex. 32 (Knoblauch at  2:1-3, 2:21-26, 5:12-19; 6:1-11).

140.    Knoblauch describes warp knitting different textile elements, with different properties, in a single knitted panel and then cutting those textile elements out of the panel. Ex. 32 (Knoblauch at 2:1-3, 2:21-26, 5:12-19; 6:1-11).

141.    Knoblauch shows "filling area" 4, which is filler material that will be waste after the cutting process is complete.



Ex. 32 (Knoblauch at LULU_NIKEFW-0095635).

142.    JP 2002-129401 ("Yoshida") is a Japanese Unexamined Patent Application.  Ex. 33 (Yoshida at LULU_NIKEFW-0010343).

143.    Yoshida published on May 9, 2002. Ex. 33 (Yoshida at LULU_NIKEFW-0010343).

144.    Yoshida is prior art to the '749 patent.

145.    Yoshida is entitled "Knitted Fabric for Producing One-Piece Underpants and One-Piece Underpants."  Ex. 33 (Yoshida at LULU_NIKEFW-0010343).

146.    Yoshida describes making underpants, each with multiple textures, by simultaneously knitting multiple underpants with each separated by "cut remainder portion" 8.  Ex. 33 (Yoshida at LULU_NIKEFW-0010345).

147.    Yoshida explains that "cut remainder portion 8" is "a knitted fabric other than the upper piece portion 9" and that is "discarded after cutting." Ex. 33 (Yoshida at LULU_NIKEFW-0010345).

148.    Yoshida also describes the use of a "cut edge" 6.  One obtains the textiles by "cutting the cut edge of the knitted fabric." Ex. 33 (Yoshida at LULU_NIKEFW-0010343).

149.    The underpants in Yoshida along with the "cut remainder portion 8" and the "cut edge 6" are shown below:



1: Front upper piece
2: Back upper piece
3: Crotch portion
4: Waist portion
5: Cut edge portion
6: Cut edge
7: Ravel cord
8: Cut remainder portion
9: Upper piece
10: Knitted fabric for producing one-piece underpants

Ex. 33 (Yoshida at LULU_NIKEFW-0010343).

**D.**    **Secondary Considerations**

150.    Nike stated the following in response to lululemon's Interrogatory No. 16:

**INTERROGATORY NO. 16:**

Describe with specificity all factual bases for Your contention, if any, that there exist any secondary considerations (or objective indicia) that would bear on the fourth Graham factor in an obviousness analysis for any Asserted Claim, including an explanation of any alleged nexus between any secondary consideration and the relevant Asserted Claim and identify by Bates number documents relating to any purported secondary consideration (or objective indicia).

**RESPONSE TO INTERROGATORY NO. 16:**

Nike incorporates its General Objections into this answer. Nike objects to this Interrogatory to the extent that it seeks information protected by the Attorney-Client Privilege, the Work Product Doctrine, or any other applicable privilege or immunity.  Subject to and without waiving the foregoing objections, and to the extent Nike understands this interrogatory, Nike answers as follows: Nike contends evidence of copying bears on the fourth Graham factor for the Asserted Claims. *See Volvo Penta of the Americas, LLC v. Brunswick Corporation*, 81 F.4th 1202, 1212 (Fed. Cir. 2023) ("Objective evidence of nonobviousness includes . . . copying."). Nike identifies the following documents which are relevant to evidence of copying, and thus as containing information responsive to this interrogatory: NIKE0555925; NIKE0555947; NIKE0556031; NIKE0556071; NIKE0556100; NIKE0009073; NIKE0009106; and NIKE0009128.

Ex. 34 (Nike, Inc.'s Responses and Objections to lululemon USA Inc.'s Fifth Set of Interrogatories

(Nos. 10-23) at 46).

151.    ██████████████████████████████████████████

152.    ████████████████████████████████████████.

153.    NIKE0555925 is a Complaint for Patent Infringement filed in the Central District of California by Nike against Skechers U.S.A., Inc.

154.    NIKE0555947 is a request by Nike to the International Trade Commission requesting the commencement of an Investigation into patent infringement by adidas AG, adidas North America, Inc., and adidas America, Inc.

155.    NIKE0556031 is a First Amended Complaint for Patent Infringement filed in the United States District Court District of Massachusetts by Nike against Puma North America, Inc.

156.    NIKE0556071 is a Complaint for Patent Infringement filed in the United States District Court for the District of Massachusetts by Nike against New Balance Athletics, Inc.

157.    NIKE0556100 is a Complaint for Patent Infringement filed in the United States District Court District of Oregon by Nike against adidas AG, adidas North America, Inc., and adidas America, Inc.

158.    ████████████████████████████████████████████████████.

159.    Nike's technical expert Dr. Pastore did not refer to any secondary considerations in his expert reports.  *See generally*, Ex. 4 and Ex. 18.

**E.    <u>Person Having Ordinary Skill in the Art</u>**

160.    lululemon's expert David Brookstein contends that for the '749 patent a skilled artisan would have had a bachelor's degree in textile engineering, mechanical engineering, or a similar technical degree and at least 3 years of experience working with knitted textiles for use in fabric-based articles, including apparel such as footwear.  For individuals with different educational backgrounds, a person could still be of ordinary skill in the art provided that person's additional experience compensates for any differences in that person's education. Ex. 35 (Brookstein Opening Expert Rep. at ¶163).

161.    Nike's definition of a person of ordinary skill the art for the '749 patent is a person with at least a few years of experience in the footwear industry, a bachelor's degree in textile-related sciences, a bachelor's degree in engineering, or equivalent academic experience.  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶53).

162.    Neither expert believes their testimony would change based on the adopted definition of a person having ordinary skill in the art.  Ex. 35 (Brookstein Opening Expert Rep. at ¶167); Ex. 18 (Pastore Rebuttal Expert Rep. at ¶55).

**F.    Other Undisputed Facts Regarding Obviousness**

163.    Nike's expert Dr. Pastore testified that a skilled artisan would not use all textures in a knitted textile element in the surrounding textile structure because such an "approach would defeat the benefits of this methodology."  Ex. 5 (Pastore Depo. Tr. at 102:19-103:7).

164.    Nike's expert Dr. Pastore testified that "[g]enerally speaking, the idea here is to make the surrounding textile as simple and inexpensive and low use of material as possible and allow the textile element, the shoe part, to have all the necessary features and use whatever performance structure, yarns, et cetera, that are necessary for the designer's goals, only have to happen with inside the textile element.  Sof if we're going to take the high performance aspects of the shoe and put it in the surrounding textile, we've slowed down production process, we've used additional materials, we've lost efficiency."  Ex. 5 (Pastore Depo. Tr. at 103:9-104:4).  Dr. Pastore testified that "a skilled artisan making shoes in 2004 would have been motivated to make shoes cost effectively."  Ex. 5 (Pastore Depo. Tr. at 236:7-10).

165.    Dr. Pastore testified that for "the knitted textile element [to have] at least one knitted texture that differs from a knitted texture in the surrounding knitting textile structure" as required by Claim 1 of the '749 Patent, "there has to be a texture inside the [textile] element that is not found in the surrounding textile [structure]." Ex. 5 (Pastore Depo. Tr. at 100:15-18).  Dr. Pastore admitted that "a knitted textile element having two textures, Texture A and Texture B, and the surrounding knitted textile structure is only Texture A" would be within the scope of the claim language "because the knitted textile element would have a knitted texture, B, that does not exist in the surrounding textile structure."  Ex. 5 (Pastore 97:20-98:9).

166.    Nike's expert Dr. Pastore relied on the same arguments regarding why claim 13 was not obvious in view of the a3 Shoe and Wrestling Shoe as he did for claim 1.  Ex. 18 (Pastore Rebuttal Expert Rep. at ¶¶123-126, 156-159).

167.    Nike's expert Dr. Pastore testified that one could incorporate a visible outline or an invisible outline and meet the claim limitations requiring an outline. Ex. 5 (Pastore Depo. Tr. at 267:3-20, 268:13-270:2, 273:16-274:6).  Dr. Pastore testified that claims requiring an outline "prohibits us from just randomly having different textures and cutting random shapes out of the structure and saying, aha, I've invented a new shoe." Ex. 5 (Pastore Depo. Tr. at 270:4-22, 275:21-276:17).

168.    When asked if there was a reason if you are mass producing shoes that you would not want to include an outline, Dr. Pastore stated "Not if it's a well-designed shoe with multiple textures that have very specific design goals.  Including an outline would improve the quality of the product you're making" and confirmed a skilled artisan would have understood that in 2004. Ex. 5 (Pastore Depo. Tr. at 276:18-277:9).

169.    Dr. Pastore also testified that if you do not include an outline "You wouldn't be achieving the precise goals of the designer."  Ex. 5 (Pastore Depo. Tr. 278:8-12, 278:22-279:3).


Dated:  July 29, 2024

                                        Respectfully submitted,

                                        /s/ Ali S. Razai
                                        Ali S. Razai
                                        Joseph F. Jennings
                                        Brandon G. Smith
                                        KNOBBE MARTENS OLSON & BEAR LLP
                                        2040 Main Street, 14th Floor
                                        Irvine, CA 92614-3641
                                        Tel.: (949) 760-0404

Inzer C. Ni
inzer.ni@knobbe.com
Stacy Rush
stacy.rush@knobbe.com
KNOBBE MARTENS OLSON & BEAR LLP
1155 Avenue of the Americas, 24th Floor
New York, NY 10036
Tel: (212) 849-3000

Jonathan E. Bachand
Jonathan.bachand@knobbe.com
KNOBBE MARTENS OLSON & BEAR LLP
1717 Pennsylvania Avenue N.W.
Suite 900
Washington, DC 20006
Tel: 202-640-6400

Yanna S. Bouris
Yanna.bouris@knobbe.com
KNOBBE MARTENS OLSON & BEAR LLP
1925 Century Park East
Suite 400
Los Angeles, CA  90067
Tel: (310) 551-3450

*Attorneys for Defendant*
LULULEMON USA INC.